## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PROVIDENT GROUP – EMU
PROPERTIES LLC, and PRESTON
HOLLOW COMMUNITY CAPITAL,
INC.,

                    Plaintiffs,           Case No.

vs.                                     Hon.

THE BOARD OF REGENTS OF
EASTERN MICHIGAN UNIVERSITY,

                    Defendant.

---

## COMPLAINT

NOW COME Plaintiffs, PROVIDENT GROUP – EMU PROPERTIES LLC and PRESTON HOLLOW COMMUNITY CAPITAL, INC., by and through their attorneys, SQUIRE PATTON BOGGS (US) LLP and HOOPER HATHAWAY, P.C., and hereby complain of Defendant THE BOARD OF REGENTS OF EASTERN MICHIGAN UNIVERSITY, as follows:

## THE PARTIES

1.      Plaintiff Provident Group-EMU Properties LLC ("Provident Group") is a limited liability company duly incorporated in the State of Arizona with its headquarters at 6656 Bankers Avenue, Baton Rouge, Louisiana 70808. Provident

- 1 -

Group's sole LLC member is Provident Resources Group Inc., a not-for-profit corporation incorporated in the State of Georgia with its headquarters at 5565 Bankers Avenue, Baton Rouge, Louisiana 70808.

2.     Plaintiff Preston Hollow Community Capital, Inc. ("PHCC Inc.") is a corporation duly incorporated in the State of Maryland with its headquarters at 7 Paul Street, Suite 820, Baltimore, Maryland 21202.

3.     Defendant is the Board of Regents of Eastern Michigan University ("EMU" or the "University").  EMU is a public university located in Ypsilanti, Washtenaw County, Michigan that was established in 1849 and is one of 15 public universities in Michigan.  Spread over 800 acres, EMU's campus is made up of over 120 buildings and residents halls.  Over 21,000 students attend EMU, and EMU employs over 2,400 employees.  The Board of Regents of the University is the governing body of EMU.

4.     Pursuant to the operative agreement between the parties, service of process may be made upon the University by registered or certified mail directed to Board of Regents of Eastern Michigan University, 101 Welch Hall, Ypsilanti, Michigan 48197; Attention: Chief Financial Officer and Treasurer to the Board of Regents, with a copy to Gloria Hage, prior General Counsel and Lauren London, General Counsel, Eastern Michigan University, 11 Welch Hall, Ypsilanti, Michigan 48197.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims set forth in this Complaint pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), excluding interest, costs, and attorney fees, and there is complete diversity of citizenship among the parties.

6.     Venue is proper in the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b) because all of the events giving rise to this action occurred in the County of Washtenaw, State of Michigan, which is located within the Southern Division of the Eastern District of Michigan.

7.     Plaintiffs' Complaint is timely filed within the applicable statute of limitations.  Plaintiffs have satisfied all of the procedural conditions precedent to filing this Complaint, including those set forth in the dispute resolution provision in the operative contract between the parties.

## GENERAL ALLEGATIONS

8.     In 2017, EMU determined to enter into a public-private partnership to operate its campus parking operations.  In so doing, EMU became one of the first public universities in the United States – and the first public university in Michigan – to enter into a public-private partnership in connection with its parking system. Public universities have increasingly sought public-private partnerships to operate and monetize their non-core academic functions as a way of both making those

operations more efficient, and to draw on non-tax dollars to assist with major capital projects – often necessitated by state funding shortfalls.

9.      Following an extensive public bid process, EMU selected Preston Hollow Community Capital, LLC ("PHCC LLC" or the "Original Concessionaire") as its contractual counterparty to operate EMU's campus parking system.  In so doing, EMU determined that PHCC LLC's bid proposal "yields the maximum financial value while providing a great parking operator for the university."

10.    PHCC LLC and its affiliates are recognized as expert professionals in the field of public-private partnerships.  PHCC LLC and affiliates routinely provide charitable support and socially impactful financing solutions to higher education institutions throughout the country in need of capital, assisting with the development, construction, and/or monetization of collegiate non-academic operations.

A.    **The Concession Agreement**

11.    On or about January 4, 2018, the Original Concessionaire and EMU executed the Concession Agreement for the Eastern Michigan University Parking System (the "Concession Agreement").  The Concession Agreement is attached hereto as Exhibit A.

12.    Pursuant to the Concession Agreement, in exchange for consideration of $55 million paid to the University at closing, which was raised via tax-exempt

financing, and a commitment to spend $4.2 million in capital expenditures to enhance EMU's parking, PHCC LLC was awarded the exclusive and irrevocable right to operate EMU's parking system, defined under the Concession Agreement as certain of EMU's parking facilities, street metered spaces, street permit spaces, and parking system assets (the "Parking System"), for a term of 35 years starting from the Concession Agreement's April 18, 2018 closing date.

13.     As contemplated under Section 17.1 of the Concession Agreement, on April 1, 2018, the Original Concessionaire and EMU agreed that the Original Concessionaire would assign certain rights in the Concession Agreement and the Parking System to Plaintiff Provident Group, pursuant to an Assignment and Assumption Agreement (the "Assignment Agreement").   The April 1, 2018 Assignment Agreement is attached hereto as Exhibit B.  Plaintiff Provident Group therefore became a party to the Concession Agreement.

14.     As also contemplated under Section 17.1 of the Concession Agreement, the Original Concessionaire remained a party to the Concession Agreement as owner of certain debt used to finance the long-term tax-exempt financing that was used to fund the Concession Agreement and, accordingly, as Note Owner Representative. As further permitted under Section 17.1 of the Concession Agreement, on January 5, 2023 PHCC LLC gave notice of its appointment of its affiliate, Plaintiff PHCC Inc., as substitute Note Owner Representative.   The January 5, 2023 notice is

attached hereto as <u>Exhibit C</u>.  Therefore, Plaintiffs Provident Group and PHCC Inc. will hereafter be referred to collectively as the "Concessionaire."

15.     Under the Concession Agreement, EMU made certain representations and warranties, including in Section 9.1(l), in which EMU represented and warranted that "[t]o the knowledge of the University, the factual and past historical information regarding the Parking System that the University provided to the Concessionaire, including all information set forth in the attached Schedules, was accurate in all material respects at the time such information was prepared and remains true as of the date hereof."

16.     Section 12.2 of the Concession Agreement further provides the Concessionaire the right to recoup any losses "based upon, arising out of, related to, occasioned by or attributable to" any breach of or failure to comply with EMU's representations and warranties.

17.     The Concession Agreement also entitles the Concessionaire to recover from EMU if certain "Adverse Actions" occur.  For example, an "Adverse Action" occurs under Article 14 of the Concession Agreement if "the City of Ypsilanti, the County of Washtenaw, the State of Michigan, or the University," or any other "Governmental Authority," "takes any action or actions at any time during the Term and the effect of such action or actions, individually or in the aggregate, is reasonably

expected (i) to be principally borne by the Concessionaire… and (ii) to have a material adverse effect on the fair market value of the Concessionaire Interest[.]"

18.    The Concession Agreement also provides relief for "Delay Events," which include events of force majeure (specifically defined to include epidemics and quarantine restrictions); "the enactment of a new Law or the modification, amendment or change in the enforcement or interpretation of a Law (including a change in the application thereof by any Governmental Authority) arising after a Bid Date"; and/or any breach of EMU representations and warranties and/or failure to "observe on a timely basis any of its covenants or obligations" under the Concession Agreement.

19.    Under Article 15 of the Concession Agreement a "Delay Event" may excuse the Concessionaire's performance and/or may entitle the Concessionaire to "compensation to restore the Concessionaire to the same economic position as it would have been in had such Delay Event not occurred."  Further, to the extent a Delay Event "has the effect of causing physical damage or destruction" to the Parking System it entitles the Concessionaire to extend the Term of the Concession Agreement "for a period that would be sufficient so to compensate the Concessionaire and to restore it to the same economic position as it would have been in had such Delay Event not occurred."

20.     The removal of parking spaces from the Parking System also entitles the Concessionaire to compensation under the Concession Agreement.   Under Section 7.2(b), "temporary" removals of parking spaces are compensable if they are "not in response to any action or omission on the part of the Concessionaire… or the failure of the Concessionaire to comply with the terms of this Agreement," and if they reduce parking revenue by $25,000 or more during a 360 consecutive day period.

21.     Under Section 7.2(d) of the Concession Agreement, parking spaces are deemed to be permanently removed after 12 months after continued closure that is not due to the acts or omissions of the Concessionaire.  The Concessionaire is also entitled to compensation for permanent removals of parking spaces under Section 7.4 of the Concession Agreement.

22.     Under Section 4.3 of the Concession Agreement, EMU bears responsibility for maintaining "Affected Property," which is defined to include "any public or private property under the jurisdiction or control of the University… that is located above, within the boundaries of, intersects with, provides access to, crosses over or under, or is adjacent to or adjoins any Parking Space or Parking Facility or any part thereof."

23.     Under Section 2.1 of the Concession Agreement, the Concessionaire has "the right… to access all portions of the Parking System and any other real

property owned or leased by the University to the extent reasonably necessary to carry out the Concession's obligations hereunder."

24. Finally, Section 12.2 of the Concession Agreement allows the Concessionaire to recover any and all "Losses actually suffered or incurred by the Concessionaire … based upon, arising out of, related to, occasioned by or attributable to (i) any failure by the University or its Representatives to comply with, observe or perform any of the covenants, obligations, agreements, terms or conditions in this Agreement or… any breach by the University of its representations and warranties set forth herein."

## B. The University's Representations And Warranties Concerning Parking Spaces

25. In Schedule 3 of the Concession Agreement, EMU represented that there were 9,633 total parking spaces in the Parking System.

26. However, an "EMU Space Audit" dated September 28, 2020 revealed that the true and correct number of parking spaces in the Parking System was just 9,495 – a shortfall of 139 parking spaces – a figure that was later updated and confirmed by the University to be 138 spaces.

27. Concessionaire sent a Notice of Adverse Actions and Delay Events concerning EMU's misrepresentation concerning parking spaces on April 5, 2022.

28.     Concessionaire sent a Supplemental Notice of Adverse Actions and Delay Events concerning EMU's misrepresentation concerning parking space on February 13, 2023.

29.     EMU contests this claim.

**C.**     **EMU's Representations And Warranties Concerning The EMU Central Parking Garage**

30.     The EMU Central Parking Garage is part of the EMU Parking System that was built in the late-1960s and includes 784 parking spaces on five levels, and was included in the Concession Agreement.  Its structural system consists of steel post-tensioned tendons that provide support to the concrete floor slabs in the top four levels of the garage.

31.     Prior to the closing date of the Concession Agreement, EMU provided Concessionaire with an August 2017 report concerning the condition of the Parking System, including the EMU Central Parking Garage.  The report was prepared by Desman Design Management, a national specialist in parking structure planning, design, and restoration (the "2017 Desman Report").

32.     EMU intended parties bidding for the Concession Agreement to rely on the 2017 Desman Report.  As the 2017 Desman Report expressly stated, "The following study was conducted to provide potential bidders with pertinent background information related to the Parking System and the University, as well as to serve as the basis for determining the potential value of the System."  Moreover,

as EMU knew, the diligence period for the Concession Agreement was conducted during the winter 2017, and bidders would not have been allowed to conduct anything but visual inspections of the Central Parking Garage prior to bidding.

33.     The 2017 Desman Report included a section concerning "Capital Repair and Maintenance Assumptions."  This section projected that "Desman's engineers, along with a specialized MEP (Mechanical/Electrical/Plumbing) engineer, performed visual inspections of the Central Campus Parking Structure, in order to establish the facility's current condition.  Based on these observations and the history of previous repairs provided by the University, estimates of the probable cost to repair and maintain the structure for the next 50 years were developed."

34.     The 2017 Desman Report then set forth very modest projections of repairs and maintenance that would be required to the Central Parking Garage's structural post-tensioning system over the next 50 years:  $80,000 over the first two years; $0 during years 3-5; $15,000 in years 6-10; $23,000 in years 11-20; $30,000 in years 21-30; $40,000 in years 31-40; and $53,000 during years 41-50.

35.     Moreover, the Desman Report acknowledged that some structural repairs to the post-tensioning system would be required, but nothing like a wholesale repair and replacement of those parts: "Although the post-tensioning system is not visible, it has been assumed that, with the amount of slab deterioration observed, the system has been compromised in some locations which will require repair."

- 11 -

36.     However, upon information and belief, EMU had reason to know that the EMU Central Parking Garage had major structural issues.  Before the Concession Agreement was executed, EMU conducted several repair programs on the garage, including to its structural system.  In the course of these repairs, upon information and belief, EMU would have learned that these post-tensioned tendons were deteriorating and not well protected.

37.     In 2019, Concessionaire hired Walker Consultants ("Walker") to provide engineering services associated with planned repairs to Level 2 of the EMU Central Parking Garage.  Concessionaire also hired Ram Construction ("Ram") to perform the repair scope prepared by Walker.  In connection with its 2021 repair work, Ram exposed several post-tensioned tendons, finding that an overwhelming majority of them were broken and deteriorated.  Ram repaired the post-tensioned tendons on Level 2 of the garage, and reported that it was likely that the post-tensioned tendons on Levels 3-5 were deteriorated as well.

38.     Upon information and belief, the post-tensioned tendons in the remaining bays in the EMU Central Parking Garage are in similar condition as those that were exposed during Ram's repairs.  Consequently, Walker and Concessionaire recommended closing floors 3, 4, and 5 of the EMU Central Parking Garage until the condition of the floor slabs on those floors could be determined and appropriate repairs could be made.

39.     The Central Parking Garage was closed for additional repair work on May 26, 2021, with the bottom two levels re-opened on November 5, 2021 and the top three levels remaining closed.

40.     The Central Parking Garage was again fully closed on September 25, 2022, however, based on Walker's recommendation, due to safety concerns associated with the deteriorated condition of the post-tensioned tendons. Consequently, since September 25, 2022, the Concessionaire has been unable to use the 784 parking spaces in the EMU Central Parking Garage.

41.     Walker has provided several options for fixing the EMU Central Parking Garage, which cost estimates range from $18 million to $24 million. Conversely, Walker estimates that levelling the Central Parking Garage and converting it into a street-level parking lot would cost approximately $3 million, but at a loss of over 500 parking spaces.

42.     Concessionaire sent a Notice of Adverse Actions and Delay Events concerning the EMU Central Parking Garage closure and other issues to EMU on February 13, 2023.

43.     EMU disputes this claim.

44.     Instead, on March 2, 2023, EMU issued an improper "Notice of Default" to Concessionaire in connection with the closure of the EMU Central

Parking Garage.  EMU's March 2, 2023 Notice of Default is attached hereto as Exhibit D.

45.    EMU's March 2, 2023 "Notice of Default" asserted that Concessionaire failed to maintain and operate the Parking System and cause it to be continually open.  However, as noted above, the closure of the Central Parking Garage was necessitated by the fact that the University made false and misleading representations concerning the garage during the diligence period for the Concession Agreement.

46.    EMU's March 2, 2023 "Notice of Default" also contended that Concessionaire failed to inspect the Central Parking Garage at least once per year. According to EMU, this was so because "Concessionaire caused a Capital Asset Management Plan (CAMP) Report to be prepared" only once every other year, rather than every year, which EMU asserted was required by certain Operating Standards incorporated by reference into the Concession Agreement.

47.    First, EMU's accusation is simply false.  Concessionaire conducted all necessary and mandated inspections of the Central Parking Garage, which is how it learned of its structural deterioration.  Second, Section 22(q) of the Operating Standards that EMU cited clearly states that a CAMP report must be provided "for review by the University in connection with the Operations Plan every other year" – not every year, as EMU stated in its "Notice of Default."

**D.** **Changes To EMU And Other Governmental Policies Concerning Faculty And Staff Hiring And Parking Permits**

48.     At the time the Concession Agreement was executed, EMU had a number of policies and procedures that provided for free and/or heavily subsidized parking permits for EMU faculty and staff that had the impact of encouraging EMU faculty and staff to utilize the Parking System and increasing parking revenue.

49.     For example, at the time the Concession Agreement was signed, faculty and staff permit revenue had remained steady for many years, owing to the fact that EMU paid for permits for approximately 70 percent of its employees, pursuant to its Sponsored Parking Policy.   Nearly all remaining employees were given the opportunity to purchase heavily subsidized parking permits at rates set at $2 per week, per their union contracts.

50.     For example, and without limitation, between July 1, 2015 and July 30, 2019 EMU's policy per its contract with the Faculty Union was to "provide parking at no charge for all Faculty Members."   Similarly, EMU's policy was to provide parking permits "without cost" per its contract with its Full Time Lecturer Union between September 1, 2016 and August 31, 2018, and per its contract with the Part-Time Lecturer Union between July 1, 2013 and June 30, 2017 for those populations.

51.     However, upon information and belief, after the Concession Agreement was executed, EMU changed and/or let expire many of its parking policies, and

began requiring faculty and staff populations to purchase their own parking passes – resulting in a significant decrease in on-campus parking and revenue.

52. In addition, upon information and belief, after the Concession Agreement was executed, EMU also began adopting policies that allowed more of its faculty and staff to work from home, rather than requiring on-campus work, which also resulted in a substantial decrease in on-campus parking and revenue.

53. Moreover, upon information and belief, after the Concession Agreement was executed, EMU changed its faculty and staff hiring policies to decrease the size of those populations, which also resulted in a decrease in on-campus parking and parking revenue.

54. Concessionaire sent a preliminary Notice of Adverse Action to EMU concerning the reduction in faculty and staff permits on May 14, 2019.

55. Concessionaire then sent a formal Notice of Adverse Action to EMU concerning the reduction in faculty and staff permits on December 17, 2019.

56. Concessionaire sent a Supplemental Notice of Adverse Actions and Delay Events to EMU concerning the reduction in faculty and staff permits and other issues on April 5, 2022.

57. Concessionaire sent another Supplemental Notice of Adverse Actions and Delay Events to EMU concerning the reduction in faculty and staff permits and other issues on February 13, 2023.

58.     EMU, however, has contested and disputes Concessionaire's claim.

**E.      Changes To EMU And Other Governmental Policies As A Result Of COVID-19**

59.     Beginning in March 2020, the University and various other governmental authorities began imposing additional Adverse Actions in response to the COVID-19 pandemic.

60.     For example, on March 16, 2020, Michigan Governor Whitmer issued Executive Order 2020-11, imposing a so-called "Temporary Prohibition on Large Assemblages and Events and Temporary School Closures," which had the effect of closing EMU's campus.

61.     On March 22, 2020, Governor Whitmer issued a further Executive Order 2020-20 regarding Temporary Restrictions on the Use of Places of Public Accommodation, which also prohibited EMU from operating.

62.     On March 23, 2020, Governor Whitmer issued Executive Order 2020-21 regarding Temporary Requirement to Suspend Activities that Are Not Necessary to Sustain or Protect Life, which closed most schools and businesses in Michigan, including EMU's campus.

63.     Accordingly, and consistent with Governor Whitmer's Executive Orders, on March 11, 2020, EMU announced it would move all on-campus classes to remote learning until at least March 31, 2020.

64.    On March 15, 2020, EMU also announced that all staff and faculty should not come to campus and should work from home unless told otherwise by their supervisors.

65.    On March 15, 2020, EMU announced that all auxiliary services would be closed until the foreseeable future and encouraged residential students to move out of on-campus housing.

66.    On March 18, 2020, EMU extended online learning until at least April 27, 2020.  And on April 24, 2020, EMU announced that any remaining students should move out of their dorms by May 1, 2020, and that employees should continue working remotely through May 15, 2020.

67.    On June 8, 2020, EMU announced that 100 percent remote learning would continue through the first half of the summer.  On August 24, 2020, EMU delayed student move-in to September 17, 2020 and in-person classes to September 20, 2020.  EMU's fall semester courses began virtually on August 31, 2020.

68.    On November 19, 2020, EMU announced that, again, almost all classes would be moved to remote learning as of November 18, 2020 due to State of Michigan guidelines, and by December 7, 2020, EMU stated that its fall semester included only approximately 10 percent of its classes on campus, with approximately 10 percent of classes to be held on campus during the winter semester as well.

69.     On January 28, 2021, EMU stated that expanded virtual and hybrid classes would likely be offered for the 2021/2022 school year. And, indeed, on March 4, 2021, EMU announced that the first session of summer semester would include a limited number of classes on campus.

70.     Upon information and belief, EMU continues to adopt policies and procedures encouraging and allowing remote learning at the expense of on-campus instruction that have had the effect of reducing the use of EMU's parking system.

71.     Concessionaire sent a Delay Event Notice concerning EMU's transition to virtual learning on April 6, 2020.

72.     On April 5, 2022, Concessionaire sent a Supplemental Notice of Adverse Actions and Delay Events concerning EMU's transition to virtual learning and other issues.

73.     On February 13, 2023, Concessionaire sent a Supplemental Notice of Adverse Actions and Delay Events concerning EMU's transition to virtual learning and other issues.

74.     EMU has contested and disputes this claim.

## COUNT I
### (BREACH OF CONTRACT – EMU'S REPRESENTATIONS AND WARRANTIES REGARDING PARKING SPACES)

75.     Concessionaire incorporates Paragraphs 1 through 74 of this Complaint as if fully restated herein.

- 19 -

76.     EMU represented and warranted that the Parking System included 9,633 parking spaces in Schedule 3 of the Concession Agreement.

77.     In reality, however, an audit dated September 28, 2020 revealed that the true and correct number of parking spaces in the Parking System was 138 spaces fewer than EMU represented.

78.     Section 9.3 of the Concession Agreement provides, "No investigations made by or on behalf of any Party at any time shall have the effect of waiving, diminishing the scope of or otherwise affecting any representation or warranty made by the other Party in this Agreement pursuant to this Agreement."

79.     EMU's misrepresentation as to the number of parking spaces in the Parking System entitles Concessionaire to compensation under Section 12.2 of the Concession Agreement.

80.     As a direct and proximate result of EMU's breach of its representations and warranties concerning the number of parking spaces in the Parking System, Concessionaire has been damaged in an amount of at least $787,916.54, representing the pro rata loss in value of 138 parking spaces, which damages continue to accumulate and be incurred.

81.     EMU has refused to compensate Concessionaire for this misrepresentation, despite due demand.

## COUNT II
### (BREACH OF CONTRACT – CLOSURE OF THE EMU
### CENTRAL PARKING GARAGE)

82.     Concessionaire incorporates Paragraphs 1 through 81 of this Complaint as if fully restated herein.

83.     Through the 2017 Desman Report, which EMU intended Concessionaire to rely on in negotiating and executing the Concession Agreement, EMU misrepresented the structural condition of the EMU Central Parking Garage as requiring only minimal repairs over the 35-year term of the Concession Agreement.

84.     Concessionaire in fact did rely on the representations contained in the 2017 Desman Report.

85.     Importantly, Section 9.3 of the Concession Agreement provides, "No investigations made by or on behalf of any Party at any time shall have the effect of waiving, diminishing the scope of or otherwise affecting any representation or warranty made by the other Party in this Agreement pursuant to this Agreement."

86.     In reality and as set forth above, a significant number of post-tensioned tendons in the EMU Central Parking Garage are compromised, rendering the garage unsafe, and requiring its partial closure since November 5, 2021 and its total closure since September 26, 2022.

87.     As a result, Concessionaire has lost revenue associated with the 784 parking spaces located in the EMU Central Parking Garage.

88.     EMU's misrepresentation as to the structural condition of the EMU Central Parking Garage entitles Concessionaire to compensation under Section 12.2 of the Concession Agreement.

89.     In addition, the removal and closure of parking spaces within the Central Parking Garage entitles Concessionaire to compensation under Section 7.2 and Article 15 of the Concession Agreement.

90.     As a direct and proximate result of EMU's breach of its representations, warranties, and duties concerning the structural condition of the EMU Central Parking Garage and the required closure of the EMU Central Parking Garage, Concessionaire has been damaged in an amount of at least $4,476,279.46, representing the pro rata loss in value of 784 parking spaces, which damages continue to accumulate and be incurred.

91.     EMU has refused to compensate Concessionaire for this misrepresentation, despite due demand.

## COUNT III
### (BREACH OF CONTRACT – CHANGES IN POLICY RELATING TO COVID-19)

92.     Concessionaire incorporates Paragraphs 1 through 91 of this Complaint as if fully restated herein.

93.     Starting in March 2020 and as a result of the COVID-19 pandemic, EMU, the State of Michigan, and various other Governmental Authorities changed policies and enacted new policies and laws that dramatically decreased student, faculty, and staff presence on the EMU campus, as more fully described above.

94.     These policy enactments and enactments of laws constitute Adverse Actions under Article 14 of the Concession Agreement, entitling Concessionaire to compensation.

95.     These policy enactments and enactments of laws also constitute Delay Events under Article 15 of the Concession Agreement, entitling Concessionaire both to compensation and to extend the term of the Concession Agreement.

96.     The Adverse Actions and Delay Events described in this Count III of Concessionaire's Complaint are ongoing.

97.     As a direct and proximate result of the Adverse Actions and Delay Events described in Count III of Concessionaire's Complaint, the Concessionaire has been damaged in an amount of at least $4,861,845, representing lost revenue from the beginning of the COVID-19 pandemic until the present, which damages continue to accumulate and be incurred.

98.     In addition and/or in the alternative, as a direct and proximate result of the Adverse Actions and Delay Events described in Count III of Concessionaire's

Complaint, the Concessionaire is entitled to extend the term of the Concession Agreement in an amount necessary to compensate it for its losses.

99.    EMU has refused to compensate Concessionaire for these Adverse Actions and Delay Events, despite due demand.

## COUNT IV
## (BREACH OF CONTRACT – CHANGES IN POLICY RELATING TO FACULTY AND STAFF PARKING PERMITS)

100.   Concessionaire incorporates Paragraphs 1 through 99 of this Complaint as if fully restated herein.

101.   Starting in the 2018/2019 school year, EMU has adopted various policies and practices to decrease hiring of faculty and staff, and to decrease the number of parking permits provided to its faculty and staff.

102.   These EMU policies and practices constitute Adverse Actions under Article 14 of the Concession Agreement, entitling Concessionaire to compensation.

103.   As a direct and proximate result of EMU's policies and practices described in this Count IV to the Complaint, Concessionaire has been damaged in an amount of at least $824,444, which damages continue to accumulate and be incurred.

104.   The University has refused to compensate Concessionaire for these Adverse Actions, despite due demand.

## COUNT V
## (DECLARATORY JUDGMENT – IMPROPER NOTICE OF DEFAULT)

105.   Concessionaire incorporates Paragraphs 1 through 104 of this Complaint as if fully restated herein.

106.   On March 2, 2023, EMU issued a Notice of Default to Concessionaire, improperly asserting that the closure of the EMU Central Parking Garage constituted an event of default under the Concession Agreement in that it was allegedly a failure of Concessionaire to comply with, perform, and/or observe a material obligation under the Concession Agreement.

107.   The March 2, 2023 notice also asserted incorrectly that Concessionaire failed to properly inspect the Central Parking Garage.  In truth, Concessionaire inspected the Central Parking Garage exactly as specified in the Concession Agreement.

108.   The EMU Central Parking Garage closure did not occur as the result of the Concessionaire's breach, but rather because EMU misrepresented the condition of the garage before the Concession Agreement was executed.

109.   An actual controversy of sufficient immediacy has arisen and now exists between Concessionaire and EMU concerning their respective rights and duties under the Concession Agreement and EMU's Notice of Default.

110.   Accordingly, Concessionaire seeks a declaration that (a) it has not breached the Concession Agreement with respect to the closure of the EMU Central Parking Garage, and (b) EMU's Notice of Default is improper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter judgment as against Defendant as follows:

a.   Economic damages in an amount sufficient to fully compensate Plaintiffs for their losses, but not less than $10,950,485;

b.   A declaration of Concessionaire's rights under the Concession Agreement to the effect that Concessionaire has not materially breached the Concession Agreement, and EMU's Notice of Default to the contrary is improper;

c.   Costs, interest, and reasonable attorney fees; and

d.   Such other and further equitable relief as this Court deems just.

Respectfully submitted,

Dated: March 20, 2023      By: */s/ Angela L. Jackson*
Angela L. Jackson (P53930)
HOOPER HATHAWAY, P.C.
126 S. Main St.
Ann Arbor, MI 48104
T + 734 662 4426
ajackson@hooperhathaway.com

OF COUNSEL:

*/s/ Sarah K. Rathke*
Sarah K. Rathke (application for admission
forthcoming)
SQUIRE PATTON BOGGS (US) LLP
Ohio Bar No. 0074280
1000 Key Tower
127 Public Square
Cleveland, Ohio 44114
T +1 216 479 8500
F +1 216 479 8780
sarah.rathke@squirepb.com

Alexis B. Chandler (application for
admission forthcoming)
SQUIRE PATTON BOGGS (US) LLP
Texas Bar No. 24120387
2200 Ross Avenue, Suite 4100W
Dallas, Texas 75201
T + 1 214 758-1500
F + 1 214 758-1550
alexis.chandler@squirepb.com

*Attorneys for Plaintiffs*
*Provident Group-EMU Properties LLC and*
*Preston Hollow Community Capital, Inc.*